## STATE OF IOWA;

## DES MOINES, DECEMBER TERM, A. D. 1862.

IN THE SEVENTEENTH YEAR OF THE STATE.

---

PRESENT:

Hon. CALEB BALDWIN, Chief Justice.
   "   GEORGE G. WRIGHT, ⎱ Judges.
   "   RALPH P. LOWE,    ⎰

---

## McLenan *et al.* v. Sullivan *et al.*

1. Resulting Trust. When land is purchased by one party with money furnished by another, an implied or resulting trust arises, the purchaser becoming a trustee.

2. Case re-affirmed. *Sullivan* v. *McLenan*, 2 Iowa, 437, re-affirmed.

3. Statute of Limitation. When the legal title to real estate has been obtained by fraud, an action to recover by the actual or equitable owner may be commenced at any time within five years after the discovery of the fraud. Code of 1851, §§ 1659, (clause 3,) and 1660.

McLenan v. Sullivan.

*Appeal from Dubuque City Court.*

FRIDAY, OCTOBER 10.

THE facts are fully stated in the opinion of the court.

*Wiltse & Blatchley,* and *Smith, McKinlay & Poor,* for the appellants, as to the statute of limitations, cited *Bowman* v. *Wathan,* 1 How., 189; Ang. Lim., 190; *Gould* v. *Gould,* 3 Story C. C. R., 539; *Ferson* v. *Sanger,* 1 Wood. & Min. C. C. R., 138; as to the assignment of a right of action for a fraud, *Brace* v. *Reed,* 3 G. Greene, 422.

*Samuels, Allison & Crane* and *O'Neil* and *McLenan,* for the appellees, as to the statute of limitations, cited Rev. of 1860, § 2741; 2 Story Eq. Jur., § 1521; *Ferris* v. *Henderson,* 12 Penn. St., 49; *Raymond* v. *Simondson,* 4 Blackf., 49.

LOWE, J. — In the spring of 1847 the Federal Government sold at public outcry the mineral lands lying around the city of Dubuque. These lands were previously possessed by a large number of occupants, whose claims were of different and irregular sizes, not corresponding with the lines of the government surveys. These occupants formed a claim association, under a constitution and a written agreement, which they respectively signed, including the parties to this suit. The object of this association and agreement was to settle by arbitration prior to the public sales, the rights to disputed claims, and to protect each real and bona fide owner in the purchase of his claim, as thus ascertained, settled and designated, on a plat of the lands made for that purpose. To carry out more certainly and conveniently this purpose, public bidders were appointed to attend the government sales, and bid off the lands, and reconvey to the several owners their appropriate quantity, or according to their respective interests.

Lot 173, the particular tract now in controversy, was a contested claim prior to the public sales, and the rights of ownership were duly adjusted as in other controverted claims, and it was found, and so decided, that the plaintiffs were the lawful claimants of one undivided half of said tract, the defendant Sullivan and one Levans an undivided one-fourth each, and it was so marked upon the plat above described. This lot was situated in and formed a fractional part of several sections. All except so much as was situated outside of the W. $\frac{1}{2}$ of the S. E. $\frac{1}{4}$ of Sec. 23 was bid off in the name of George L. Nightingale, for the benefit of the claimants.

At this time the plaintiffs were non-resident minors, living in Cincinnati, Ohio. Their father, Bernard McLenan, who had made or purchased the claim, had died sometime before the land sales. Just prior to the sale, however, their elder brother, John McLenan, had gone to Dubuque, from Ohio, and attended to the establishment of the claim before the requisite arbitrating committee, and paid all necessary charges and expenses therefor.

During the same visit, at the urgent request of Sullivan, he, the said John, loaned him some $440, on terms much less than the value of money at that time, but under a special contract that in consideration of this favor, he, the said Sullivan, would look after and protect the claim that had been awarded to the heirs of Bernard McLenan, deceased, and that he would advance for said heirs at the sales whatever sum of money should be necessary to pay the government for their land, the amount to be subsequently credited, however, upon the loan.

This was the condition of things at the date of the sales of these mineral lands, when George L. Nightingale bid off so much of lot 173 as laid outside of the W. $\frac{1}{2}$ of S. E. $\frac{1}{4}$ of Section 23, and took the certificate of purchase in his own name, in trust and for the use of the real claimants.

The money to pay for the same was advanced, but by whom the said Nightingale could not recollect. Yet we are satisfied from all the evidence submitted in the case, that the money was advanced for the McLenans, in all probability by Sullivan, under the special contract above specified. A short time subsequently to this, the heirs of McLenan being non-residents, Sullivan set up a claim to all the land in controversy, except the one-fourth claimed by Levans, and demanded a deed of the said Nightingale for the same, but he refused to make a deed to the one undivided half, which he stated he knew belonged to the heirs of McLenan. Thereupon Sullivan instituted a suit against the said Nightingale and the heirs aforesaid, to recover a conveyance of said land to him. He afterwards obtained a decree to that effect by default, by dismissing his bill as to the McLenans, and persuading Nightingale not to appear and contest the same. In accordance with the terms of this decree, Nightingale conveyed to Sullivan the equitable interest which the said McLenans had in said land. This was on the 19th day of December, 1847. We have already said that a part of lot 173, in which the parties were interested, was situated in the W. $\frac{1}{2}$ of the S. E. $\frac{1}{4}$ of Section 23. This part, in connection with other lands, was bid off, under the arrangements of the claim association, in the name of John G. Shields, for the use of the respective claim owners. The right of the McLenan heirs to an undivided half of this part, being thirteen acres, more or less, was precisely the same, having the same origin and foundation as their right or interest to the other portions of lot 173, bid off by Nightingale. In May, 1854, when Wm. McLenan, one of the plaintiffs in this case, visited Dubuque, to look after the business and interests of himself and co-heirs, he found the said Shields still holding the legal title to a part of their land, that which is herein referred to, in section 23, and procured from him a legal conveyance of the same, or

a declaration of his trust in favor of said heirs.   In October following, Sullivan filed his bill to set aside this conveyance, claiming to have the equitable, and asking to be invested with the legal, title.   His bill was dismissed in the court below, and on an appeal met with the same fate, so far as the McLenans are concerned, in this court, where the cause was fully considered, both upon the law, and the facts of the case.   The substance of that decision was that Sullivan had no interest beyond an undivided fourth in the thirteen acres above described; that Levans had a fourth, and the McLenans a half; that there was a resulting trust from Shields, who had the legal title, to these parties, his *cestui que trust*, following the general rule, that where land is purchased by one, with money furnished by others, an implied or resulting trust arises, and the former becomes a trustee for the latter.

Following this decision, William McLenan and his sister, Margaret Laboyteaux, with her husband Isaac N. Laboyteaux, having purchased out the interest of John McLenan, did, in May, 1859, institute the suit at bar, to recover the legal title, (that it might be united with the equitable, which they claimed to have,) of the undivided half of that part of mineral lot 173, which lies outside of the W. ½ of the S. E. ¼ of section 23, and which Michael J. Sullivan, the husband and father of the main defendants in this case, wrongfully possessed himself of, in the suit first above referred to, of himself against Nightingale and the McLenans. The right to do so, and to obtain relief, was virtually decided in the latter of the cases above alluded to, wherein the said Michael J. Sullivan was the plaintiff, and Shields and others the defendants.  *Sullivan* v. *McLenan*, 2 Iowa, 437.

The same questions, both of law and fact, that arise in this case, were fully discussed and determined in that case against the then plaintiff, Sullivan.

We find no reason for changing the opinion we then expressed upon these questions, or for re-discussing the same, at length. Many of the facts which we have stated above, are founded upon and fairly sustained by the evidence in this case, which, with other facts testified to, show, in our judgment, with reasonable conclusiveness, that the plaintiffs were the true equitable owners of the land in dispute, and as such should now be clothed with the legal title.

There are, however, one or two collateral questions insisted upon, as being against the plaintiff's right to the relief prayed for in their petition. One of these is, that the plaintiff's right to recover is barred by the statute of limitations, the suit not having been brought within ten years next after the cause of action arose, as required by the fourth clause of § 1659 of the Code. The third clause, however, of the same section, in connection with § 1660 of the Code, permits relief on the ground of fraud to be granted, within five years after the discovery thereof.

The evidence shows that on the 18th or 20th of May, 1854, the plaintiffs in this suit obtained their first information that Sullivan had procured, under the color of a decree of the court, the legal title from Nightingale of the land in question, and this was within five years of the commencement of this suit. Now let us see what was the good faith of this transaction. Before the land sales by the Government, the respective claim rights of these parties were fully investigated by the tribunal which they themselves had assisted in creating, and the property in question was ascertained and decided to be, by said tribunal, one-half in the plaintiffs, and only one-fourth in the defendant, Sullivan. After this was done, Sullivan recognized the McLenans' right, and entered into a special contract with them that he would, in consideration of a certain favor granted to him, guard and protect their interest in said property.

Soon after the land sales, and when John McLenan, with whom this contract had been made, had left the state, Sullivan demanded a deed of Nightingale, the trustee, for the McLenan interest. This being refused, (as he was distinctly told by Nightingale, upon the ground that the Mc-Lenans were the lawful owners of said interest,) he instituted his suit, both against Nightingale and the McLenans, to recover the legal title to the same. Now, what method did he adopt in order to obtain a decree without bringing before the court the notice of his claim? Simply by dismissing his bill as to the McLenans, and inducing Nightingale not to appear and contest his claim, but to let a decree go by default, agreeing that no costs should be taxed against him. A statement of these facts is sufficient to exhibit the bad faith, and the fraudulent character, of this transaction, and it cannot therefore be said that the plaintiff's right of action was barred by the statutes.

The question as to the admissibility of Wm. McLenan's deposition is an unimportant one, as the case is, in our opinion, with the plaintiffs, without his testimony. Nor did the court err in dismissing the bill as to the administrator, or as to Levans, one of the tenants in common. We shall, therefore, affirm the judgment below.

Affirmed.